UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br><br>SPEEDY TAX SERVICES<br>1002 H Street, NE<br>Washington, DC 20002 | Case No. _____ |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANT UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE**

I, Crystal Womble, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as 1002 H Street, NE, Washington, DC 20002, (hereinafter referred to as "target location") further described in Attachment A for the things described in Attachment B.

2.     I  am a Special Agent of the Internal Revenue Service, Criminal Investigation (IRS-CI) assigned to the Washington, DC Field Office and have been a Special Agent for approximately seven years.   My responsibilities include the investigation of possible criminal violations of the Internal Revenue Code, covered under Title 26 of the United States Code ("USC"); the currency reporting requirements, covered under Title 31 of the USC; the money laundering statutes, covered under Title 18 of the USC, Sections 1956, 1957, and 1960; and false, fictitious, or fraudulent claims and conspiracy to defraud the government with respect to claims, covered under Title 18 of the USC, Sections 287 and 286 and related offenses.

3.     I am a graduate of the Federal Law Enforcement Training Center at Glynco, Georgia. My training included instruction on financial and criminal investigative tools, and I

have also received training in tax and criminal law that included the development and identification of probable cause to support the execution of search warrants.

4.      I received a Bachelors of Science degree in Accountancy from North Carolina Agricultural and Technical State University in May 2002 and a Masters in Business Administration from Clarkson Univeristy in May 2003.  I also have more than thirteen years of experience in the fields of accounting and tax.

5.      Based upon my training, experience, and participation in investigations involving violations of the Internal Revenue laws and related offenses,  I know that:

  a.  Persons preparing tax returns for others in return for compensation are required by law to keep, for three years, copies of tax returns or a list of the names, identification numbers, and tax years of taxpayers for whom tax returns were prepared (Title 26 USC § 6107; Reg. Sec. 1.6107-1);

  b.  Accountants and return preparers generally keep books and records and other documentation used in the preparation of tax returns that may include work papers, worksheets, journals, ledgers, bank records, receipts, bank statements, checks, deposit tickets, contracts, invoices, billing statements, cash receipt and disbursement records, client correspondence and research files, powers of attorney, copies of tax returns, other forms prepared for clients, as well as documentation provided by the client;

  c.  Accountants and return preparers often have computers and related software to schedule, compute, prepare, print, and store income tax returns, forms, documents, and other information;

  d.  I know that return preparers often retain tax documentation from previous years. For example, a return preparer may retain and use a client's 2014 tax records to assist in preparing the client's 2015 return;

  e.  I know that individuals, specifically accountants and return preparers who operate or own businesses, maintain books and records, client lists, and client payment records in order to compute their own income;

2

     f.   According to the Internal Revenue Service's Scheme Development Center ("SDC"), it is uncommon for a tax preparer to prepare a large number of tax returns for clients where every year more than 95% of the clients consistently receive refunds, rather than pay tax liability.

6.    This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## **STATUTES**

7.    Title 26 USC Section 7206(2) (Fraud and False Statements), provides in part that whoever willfully aids or assists in, or procures, counsels, or advises the preparation or presentation under, or in connection with any matter arising under, the Internal Revenue laws, of a return, affidavit, claim, or other document, which is fraudulent or is false as to any material matter, whether or not such falsity or fraud is with the knowledge or consent of the person authorized or required to present such return, affidavit, claim, or document is guilty of a felony offense.

8.    Title 18 USC Section 286 (Conspiracy to Defraud the Government with Respect to False Claims), provides that whoever enters into any agreement, combination, or conspiracy to defraud the United States, or any department or agency thereof, by obtaining or aiding to obtain the payment or allowance of any false, fictitious or fraudulent claim, shall be fined under this title or imprisoned not more than ten years, or both.

9.    Title 18 USC Section 287 (False, Fictitious or Fraudulent Claims), provides that whoever makes or presents to any person or officer in the civil, military, or naval services of the United States, or to any department or agency thereof, any claim upon or against the United States, or any department or agency thereof, knowing such claim to be false, fictitious or fraudulent, shall be imprisoned not more than five years and shall be subject to a fine in the amount provided in this title.

3

14934280.1

10.     Title 18 USC Section 1028A (Aggravated Identity Theft), provides that whoever, during and in relation to any felony violation enumerated in subsection (c)[1], knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years.

## DEFINITIONS OF INTERNAL REVENUE SERVICE TERMS

11.     **The Internal Revenue Service (IRS) :**  The IRS is an agency of the United States of America, Department of the Treasury, that maintains its headquarters at 1111 Constitution Avenue, NW, Washington, DC.  The IRS has responsibility for administering provisions of the Internal Revenue Code.

> **Form 1040-** The Form 1040 is the United States Individual Income Tax Return.   Absent the grant of an extension, individuals who earn income in excess of certain minimum amounts are typically required to file a Form 1040 series U.S. Federal Income Tax Return no later than April 15th of the calendar year immediately following the tax year.

---

[1] subsection (c) means any offense that is a felony violation of— **(1)** section 641 (relating to theft of public money, property, or rewards [1]), section 656 (relating to theft, embezzlement, or misapplication by bank officer or employee), or section 664 (relating to theft from employee benefit plans); **(2)** section 911 (relating to false personation of citizenship); **(3)** section 922(a)(6) (relating to false statements in connection with the acquisition of a firearm);**(4)** any provision contained in this chapter (relating to fraud and false statements), other than this section or section 1028(a)(7); **(5)** any provision contained in chapter 63 (relating to mail, bank, and wire fraud); **(6)** any provision contained in chapter 69 (relating to nationality and citizenship); **(7)** any provision contained in chapter 75 (relating to passports and visas); **(8)** section 523 of the Gramm-Leach-Bliley Act (15 U.S.C. 6823) (relating to obtaining customer information by false pretenses); **(9)** section 243 or 266 of the Immigration and Nationality Act (8 U.S.C. 1253 and 1306) (relating to willfully failing to leave the United States after deportation and creating a counterfeit alien registration card); **(10)** any provision contained in chapter 8 of title II of the Immigration and Nationality Act (8 U.S.C. 1321 et seq.) (relating to various immigration offenses); or **(11)** section 208, 811, 1107(b), 1128B(a), or 1632 of the Social Security Act (42 U.S.C. 408, 1011, 1307(b), 1320a–7b(a), and 1383a) (relating to false statements relating to programs under the Act).

14934280.1

**Adjusted Gross Income (AGI) -** Adjusted gross income is all of a person's taxable income received over the course of the year.   It includes wages, interest, dividends, and capital gains minus items such as contributions to a qualified IRA, some business expenses, moving costs, and alimony payments.

**Schedule A** – A Schedule A is a tax form used to itemize certain allowable tax deductions a taxpayer may claim that reduce their AGI and can reduce the resultant income tax liability. The categories of Schedule A deductions include, among others: gifts to charity, job expenses and certain miscellaneous expenses such as job travel, uniforms, and certain educational expenses that are ordinary and necessary employee expenses that are not reimbursed by the employer.

**Unreimbursed Business Expenses –** Also known as unreimbursed employee expenses - These expenses are deductible on the Schedule A if they are 1) paid or incurred during the tax year, 2) for carrying on the taxpayer's business in which s/he is an employee and 3) ordinary and necessary.  Deductible expenses include, but are not limited to, dues to professional societies, tools and supplies used for work and travel, transportation, and lodging related to the taxpayer's work (this does not include commuting to and from work).

**Schedule C-** Schedule C is a tax form used to report income or loss from a business operated or a profession practiced as a sole proprietor. An activity qualifies as a business if the primary purpose for engaging in the activity is for income or profit and the taxpayer is involved in the activity with continuity and regularity.

**Earned Income Tax Credit (EITC) –** The Earned Income Tax Credit is a refundable federal income tax credit for low- to moderate-income working individuals and families. Congress originally approved the tax credit legislation in 1975 in part to offset the burden of social security taxes and to provide taxpayers an incentive to work. When the EITC exceeds the amount

of taxes owed, it results in a tax refund to those who claim and qualify for the credit.

**Electronic Filer Identification Number (EFIN) -** A number assigned by the IRS to preparers that are accepted into the e-file program. To become an authorized IRS e-file provider, preparers must submit an application to the IRS. E-file authorization allows preparers to electronically submit returns to the IRS.

**Preparer Tax Identification Number (PTIN) -** An identification number issued by the IRS to anyone who prepares or helps prepare a federal tax return, claim for refund or other federal forms for compensation.

## <u>BACKGROUND</u>

12. On March 18, 2016, A.F.'s daughter, K.J.1, took a backpack belonging to A.F. and delivered it to personnel at the IRS Taxpayer Assistance Center (TAC) in Landover, Maryland ("the backpack"). K.J.1 saw that the contents in the backpack and used it as leverage in an attempt to have A.F. repay her the money she had given him. After A.F. did not repay Jones, she dropped the backpack off at the TAC. The backpack contained the following items: a Sanyo SCP2700 cellular telephone, a Samsung SPH-M350 cellular telephone, three IRS Form 1040 in the names of three different people, a notepad containing numerous names, Social Security Numbers (SSNs) and dates of birth (DOBs), various debit cards in the names of various people, multiple envelopes and other loose pieces of paper containing various names, DOBs and SSNs, two IRS Forms W-2 in the names of two different persons, and multiple items indicating the backpack belonged to A.F.

13. The SSNs recovered from the backpack were analyzed to determine whether any of those SSNs had identity theft indicators. There were 65 complete SSNs contained in the backpack. Approximately 38% of SSNs (or 25 out of the 65 SSNs) discovered in the backpack contained identity theft indicators. Based on your affiant's training and experience, the actual identity theft percentage of SSNs in the backpack may be even

14934280.1

higher if there are additional victims who have not yet reported or did not know to report the identity theft.

14.     There were three tax returns inside of the bag.  All three tax returns had already been filed with the IRS and were prepared by someone who was affiliated with SPEEDY TAX SERVICES (STS).  Two of the tax returns were inside a STS folder.  STS was formerly known as Instant Tax Service (ITS). ITS's franchisor is based in Indianapolis with franchises located nationwide, including the District of Columbia and Maryland.  One of the tax returns had the Indianapolis address while the other two had the DC franchise address; yet, all three returns were prepared at the target location, according to the IP address.

15.     Two of the three individuals whose tax returns were found in the bag were located and interviewed.  Both individuals, M.W. and A.G., were placed in the grand jury and stated under oath that their identification had been stolen and that they did not give A.F. or anyone at STS permission to file a tax return on their behalf for the given tax year.

16.     During the investigation, A.F.'s daughter's mother, K.J.2, was interviewed as a witness.  She was asked if she knew anything about A.F. preparing taxes and she replied, "Yea, I know [A.F.] and another female use other people's kids as dependents on returns to increase refunds and they use other people's information to file returns in their names.  [A.F.] gets the people's information and sends them to the female and they split the refunds they generate.  They get prepaid cards and they have the refunds deposited onto the prepaid card and then they get another prepaid card which they put a little bit of the money on to give back to the person who they filed the return for."  She advised that A.F. called her one day a few years ago and said, "I know how you can get $3,000, you gotta get in on this tax thing with me."  A.F. told her that all she had to do was get a prepaid card and she could get tax refunds issued on the card and she did not have to tell whoever the return was filed for how much

7

money you actually got.  She declined A.F.'s offer and stated she was aware of A.F.'s fraudulent tax scheme for at least the past two years but thinks it has probably been going on for longer than that.

17.     During the investigation, M.W. provided Facebook messages that revealed she was corresponding with A.F.  M.W. accused A.F. of stealing her identity to file a tax return.  A.F. denied this saying, "[M.W.] I don't do taxes and don't know how to, if sweet did [your] taxes I didn't know she could use any address she just used one I knew."  In her response to A.F., M.W. wrote Facebook messages that said, "Speedy Tax," and A.T.'s first name.  Although A.F. mentioned "sweet", this could have been an auto-correct word for A.T.'s first name.  This is significant because during the tax season, A.T. is the manager of STS on H Street, NE, Washington, DC.

18.     Another individual, M.L., was interviewed and swore before the grand jury her testimony.  M.L. and A.F. are friends.  M.L. stated that she believed A.T. and A.F. were involved in an ongoing scheme.  M.L. explained that A.F. would recruit people to see if they wanted their taxes done so false returns could be filed with their information.  M.L. stated that she was "special" since she and A.F. were so close; thus, she did not give her information to A.F., instead she was able to go to "the tax place on H Street" to have A.T. prepare her taxes.  M.L. admitted that she was on drugs during the time she participated in the relevant scheme and did not work the years that A.T. prepared her tax returns.

19.     The cell phones found in the backpack were analyzed.  The phones were registered to A.F.  The phone number (202) 396-6440 was found under contact name "A.T." in the phone.  (202) 396-6440 is the publicly available contact phone number for the STS at the target location.  A.F. called the number (202) 396-6440 53 times during the 2014 and 2015 tax seasons.

## **PROBABLE CAUSE**

14934280.1

20.    A.T. is the manager of STS on H Street, NE, Washington, DC during tax season but resides in Indianapolis, Indiana during the remainder of the year.  There were 239 2015 tax returns prepared at the target location, using the Speedy Tax address in Indianapolis.

21.    A.G.'s 2015 tax return was found in the backpack.  IRS records revealed that STS prepared A.G.'s 2013, 2014, and 2015 at the target location.  Each year the tax return indicated that a different tax preparer purportedly prepared A.G.'s tax return for tax years 2013 and 2015; there was no preparer listed for tax year 2014 but the IP address indicated that the tax return was prepared at the target location.  A.G.'s 2015 tax return was prepared at the target location but used the address of the Speedy Tax location in Indianapolis. All of A.G.'s tax returns that were prepared at STS are false because A.G. told the grand jury that she did not give anyone permission to file a tax return on her behalf and that she did not work during 2013, 2014, or 2015.  All of A.G.'s tax returns prepared at STS claimed that she owned her own childcare business, which caused her to make just enough income to qualify for the earned income credit, claiming an aggregate refund total of $9,766. The resident addresses used on A.G.'s 2013, 2014 and 2015 tax returns were all former addresses of A.F.

22.    D.H.'s 2013 tax return was also found in the backpack.  IRS records revealed that STS prepared D.H.'s 2012, 2013, 2014, and 2015 at the target location.  Each year the tax return indicated that a different tax preparer purportedly prepared D.H.'s tax return.  D.H.'s 2015 tax return was prepared at the target location but used the address of the Speedy Tax location in Indianapolis. All of D.H.'s tax returns that were prepared at STS are believed to be false as various family members have stated that D.H. is a drug addict and had not worked in years. All of D.H.'s tax returns prepared at STS claimed that she owned her own hair braiding business, which caused her to make just enough income to qualify for the earned income credit, claiming an aggregate refund total of $17,808. The address used on D.H.'s 2014 and 2015 tax

14934280.1

return was a former address of A.F.  The address used on D.H's 2013 tax return was found in a text message on A.F.'s phone found in the backpack.

23.   A.T. prepared M.L.'s 2012, 2013, and 2014 tax returns.  According to IRS records, there was a different tax return preparer listed for each tax year; yet, M.L. distinctly recalled A.T. preparing her tax returns each year at the target location. All of M.L.'s tax returns prepared at STS claimed that she owned her own hair braiding business, which caused her to make just enough income to qualify for the earned income credit, claiming an aggregate refund total of $9,372.

24.   A.G. 2 was the manager and return preparer at another Speedy Tax franchise located in District Heights, MD.  In 2016, A.G. 2 was indicted and pled guilty to two counts of aiding and assisting in the preparation of false tax returns, Title 26, Section 7206(2), during tax years 2010 through 2013.

25.   In November 2016, CONFIDENTIAL INFORMANT NO.1 ("C.I.1") admitted to preparing false tax returns in an attempt to remain employed.  C.I.1 stated that she learned how to prepare false tax returns from A.T.  A.T. told and showed C.I.1 how to "keep the customers happy" by adding false Schedule A deductions to the tax returns. C.I.1 stated that A.T. kept blank copies of charitable contribution forms in her desk drawer at the target location; thus, when she put a false charitable contribution on a client's tax return, she falsified the charitable contribution form and placed it in the client's folder.

26.   As the manager working at the target location, A.T. had access to her employee's PTIN, allowing her to put their PTIN on tax returns that she actually prepared.

27.   C.I.1 told investigators that on several occasions, she was made aware of A.T. preparing tax returns using C.I.1's PTIN at the target location, without C.I.1's permission.

14934280.1

28.     Based on a variety of investigative techniques, including but not limited to a review of records prepared by STS, the use of an undercover agent posing as a taxpayer in prior years leading to the indictments of A.G.2 and C.I.1, and multiple interviews, there is probable cause to believe that A.T. and A.F. are involved in a conspiracy to defraud the government and A.T. and STS are engaged in a scheme to prepare fraudulent tax returns.  Evidence of this fraudulent scheme will be found at the target location.  Generally, the available evidence indicates STS has prepared or aided and assisted in preparing Forms 1040 U.S. Individual Income Tax Return which claimed false Schedules A and Schedules C (some which used false documents) and submitted them to the IRS which caused the IRS to disseminate fraudulent tax refunds.

29.     The IRS has identified 17 different PTINs used by STS.  Since 2012, the preparers at STS have used 10 different EFINs.  Two of those EFINs are registered to H&R Block and Intuit.  The EFIN allows a registered preparer to file tax returns electronically with the IRS.  The remaining eight, are registered to STS with the contact names of either A.T. or her brother, J.T.  IRS records indicate from 2012 through 2015, tax returns have been filed by STS with Employer Identification Number ("EIN") 02-0730276, 47-5508758, and 46-1860953 all registered to A.T. or her brother. The address listed on 96% of the tax returns is "1002 H Street, NE, Washington, DC 20002." The address listed on 3% of the tax returns is the address in Indianapolis, Indiana. The phone number listed on the returns with the target location address is (202) 396-6440.

30.     STS is owned by A.T.'s brother, J.T.  No business tax returns have been filed for STS; although, A.T. filed a Schedule C Profit or Loss from a Business with her 2010-2015 Form 1040 reporting the gain received from STS.

31.     IRS records indicate it is uncommon for a tax preparer to prepare a large number of tax returns for clients where every year more than 95%  of the clients consistently

14934280.1

receive refunds, rather than pay tax liability.   IRS records indicate the target location has prepared tax returns with an unusually high refund rate since tax year 2012.   A subsequent review of all returns prepared by STS since 2012 confirmed these findings.   Below is a chart of these findings.

| | Tax Year: | | | |
|---|---|---|---|---|
| | **2015** | **2014** | **2013** | **2012** |
| Number of returns filed | 1912 | 2039 | 1686 | 2158 |
| Number of refunds | 1819 | 1949 | 1634 | 2095 |
| % of refunds | 95.1% | 95.6% | 96.9% | 97.1% |
| Amount of Refunds | $6,716,582 | $7,078,669 | $6,255,874 | $7,955,146 |

32.     A review of the tax returns prepared at the target location, excluding those prepared by A.G.2 and C.I.1, still showed an unusually high refund rate.   Below is a chart of these findings.

| | Tax Year: | | | |
|---|---|---|---|---|
| | **2015** | **2014** | **2013** | **2012** |
| Number of returns filed | 1912 | 2039 | 1686 | 2158 |
| Number of returns prepared by C.I.1 | 356 | 352 | 495 | 613 |
| Number of returns prepared by A.G.2 | 0 | 6 | 5 | 12 |
| Number of returns filed **less** those prepared by C.I.1. and A.G.2 | 1556 | 1681 | 1186 | 1533 |
| Number of refunds | 1474 | 1600 | 1148 | 1483 |
| % of refunds | 94.7% | 95.2% | 96.8% | 96.7% |
| Amount of Refunds | $5,429,026 | $6,048,108 | $4,545,636 | $5,680,456 |

33.     STS has an average refund rate of approximately 96%.   The average national refund rate for tax years 2012 through 2014 was approximately 77%[2].

34.     To demonstrate the possible number of false tax returns prepared by STS, the following table reflects the total number of tax returns filed with Schedules C and the number of those which caused the taxpayer to qualify for the earned income credit.   A review of the tax returns prepared by STS reveals that the majority of the Schedules C qualified for the earned income credit.

| Tax Year | Number of Returns with Sch C | Number (Percentage) of Sch. C that qualify for EIC |
|---|---|---|

[2] The latest tax statistical data is for tax year 2014.  Source: http://www.irs.gov/pub/irs-soi/12intaba.xls

14934280.1

| 2012 | 318 | 186 (58%) |
| 2013 | 240 | 176 (73%) |
| 2014 | 297 | 199 (67%) |
| 2015 | 286 | 164 (57%) |
| **Total** | **1,141** | **725 (63%)** |

## PROBABLE CAUSE OF EVIDENCE AT LOCATION

35.     C.I.1, a former tax return preparer, stated that client folders are maintained at the
target location.

## SURVEILLANCE

36.     Since April 15, 2016, I have conducted multiple location checks of the target location.
A sign advertising the business was posted at the top of the building above the
entrance.  The sign stated "SPEEDY TAX".   Directly below the sign was another
sign that stated "Former Instant Tax Service 202-396-6440/1-888-625-2911".  People
who appeared to be clients were going in and coming out of the target location.

37.     On November 8, 2016, the target location appeared to be closed.

38.     As of December 29, 2016, the target location has reopened.  A few people who
appeared to be clients were going in and coming out.  There were at least 4
workstations seen with computers on the top of the desks.

## TECHNICAL TERMS

39.     Based on my training and experience, and information acquired from other law
enforcement officials with technical expertise, I know the terms described below
have the following meanings or characteristics:

13

14934280.1

a.    "Computer" means "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."  See 18 U.S.C. § 1030(e)(1).

b.    "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and Jocks).

c.    "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates a digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

14

d.  "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

e.  IP Address:  The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses.  Some computers have static— that is, long-term—  IP addresses, while other computers have dynamic-that is, frequently changed-IP addresses.

f.  The Internet is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

g.  "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet.  ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, or satellite.  ISPs typically

charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports.  Many ISPs assign each subscriber an account name- a user name or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber.  By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

h.  "Internet Connection" means a connection required for access to the Internet. The connection would be provided by cable, DSL (Digital Subscriber Line), wireless, or satellite systems.

i.  A "modem" translates signals for physical transmission to and from the Internet Service Provider, which then sends and receives the information to and from other computers connected to the Internet.

j.  A "router" often serves as a wireless access point and directs traffic between computers connected to a network (whether by wire or wirelessly).  A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf.  The router also distributes to the relevant client inbound traffic arriving from the Internet.  The router is in turn typically connected to a modem.

k.  "Domain Name" means the common, easy-to-remember names associated with an Internet Protocol address.  For example, a domain name of "www.usdoj.gov" refers to the Internet Protocol address of 149.101.1.32. Domain names are typically strings of alphanumeric characters, with each level delimited by a period.  Each level, read backwards– from right to left–further identifies parts of an organization.  Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and, .edu for educational organizations.  Second-level names will further identify the

14934280.1

organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice. Additional levels may exist as needed until each machine is uniquely identifiable. For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

l.   "Website" consists of textual pages of information and associated graphic Images. The textual information is stored in a specific format known as Hyper-Text Mark-up Language (HTML) and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol (HTTP).

m.   "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website.

n.   "Secure Hash Algorithm Version 1 hash value" (SHA 1 hash value) is an algorithm that processes digital files, resulting in a 160-bit value that is unique to that file. It is computationally infeasible for two files with different content to have the same SHA 1 hash value. By comparing the hash values of files, it can be concluded that two files that share the same hash value are identical with a precision that exceeds 99.9999 percent certainty. There is, for example, no known instance of two different child pornographic images or videos having the same SHA1 hash value.

o.   "Peer to Peer file sharing" (P2P) is a method of communication available to Internet users through the use of special software, which may be downloaded from the Internet. In general, P2P software allows a user to set up files on a computer to be shared with other computer users running compatible P2P software. A user may obtain files by opening the P2P software on the user's computer and searching for files that are currently being shared on the network. A P2P file transfer is assisted by reference to

14934280.1

the IP addresses of computers on the network: an IP address identifies the location of each P2P computer and makes it possible for data to be transferred between computers. One aspect of P2P file sharing is that multiple files may be downloaded at the same time. Another aspect of P2P file sharing is that, when downloading a file, portions of that file may come from multiple other users on the network. However, a tool used by law enforcement restricts the download so that the file is downloaded, in whole or in part, from a single user on the network.

1. When a user wishes to share a file, the user adds the file to his a shared library files (either by downloading a file from another user or by copying any file into the shared directory), and the file's SHA 1 has value is recorded by the P2P software. The hash value is independent of the file name; that is, any change in the name of the file will not change the hash value.

2. Third party software is available to identify the IP address of a P2P computer that is sending a file. Such software monitors and logs Internet and local network traffic.

p. "VPN" means a virtual private network. A VPN extends a private network across public networks like the Internet. It enables a host computer to send and receive data across shared or public networks as if they were an integral part of a private network with all the functionality, security, and management policies of the private network. This is done by establishing a virtual point-to-point connection through the use of dedicated connections, encryption, or a combination of the two. The VPN connection across the Internet is technically a wide area network (WAN) link between the sites. From a user perspective, the extended network resources are accessed in the same way as resources available from a private network- hence the name "virtual private network."

14934280.1

The communication between two VP endpoints is encrypted and usually cannot be intercepted by law enforcement.

q.   "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can. In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable cipher text. This is usually done with the use of an encryption key, which specifies how the message is to be encoded. Any adversary that can see the cipher text should not be able to determine anything about the original message. An authorized party, however, is able to decode the cipher text using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

r.   "Malware," short for malicious (or malevolent) software, is software used or programmed by attackers to disrupt computer operations, gather sensitive information, or gain access to private computer systems. It can appear in the form of code, scripts, active content, and other software. Malware is a general term used to refer to a variety of forms of hostile or intrusive software.

s.   A "botnet" is a collection of compromised computers, known as "bots," that autonomously respond to and execute commands issued by the botnet's owner, often for nefarious purposes. Computers become part of a botnet by being infected with malware, which may install itself on a user's computer without the user's knowledge, often by taking advantage of web browser vulnerabilities or by tricking the user into running a Trojan horse program. Once the computer is infected and becomes a bot in the botnet, the malware can listen for, respond to, and execute commands issued by the botnet's owner, for example, to send out spam e-mail or to make connections to a

particular server as part of a distributed denial of service, or "DDoS," attack, defined below.

t.    "Carding" is an activity in which a perpetrator steals or traffics in stolen credit card information or uses stolen credit card data to buy goods and services.

u.    A Distributed Denial of Service, or "DDoS," attack on a server refers to the process of making massive requests to a particular server or domain.  The number of requests to a domain, server, or IP address eventually overwhelms the target, and causes it to stop functioning.

v.    Twitter is an online social networking service and microblogging service that enables its users to send and read text-based messages of up to 140 characters, known as "tweets." Tweets are publicly visible by default, but senders can restrict message delivery to just their followers.  Users can tweet via the Twitter website, compatible external applications (such as for smartphones), or by Short Message Service (SMS), a text messaging service component of phone, web, or mobile communication systems.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

40.    As described above and in Attachment B, this application seeks permission to search for records that might be found at the target location, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or on other electronic storage media or digital devices.  As used herein, the terms "electronic storage media" and "digital devices" include any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital

20

cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.  Thus, the warrant applied for would authorize the seizure of electronic storage media and digital devices or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

41.     *Probable Cause.*  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that if electronic storage media or digital devices are found at the target location, there is probable cause to believe that the records and information described in Attachment B will be stored in the electronic storage media and digital devices for at least the following reasons:

    i.   Individuals who engage in criminal activity, including Title 26, USC, Section 7206(2) (Aiding or Assisting in the Filing of False or Fraudulent Returns), Title 18, U.S.C. Section 286 (Conspiracy to Defraud the Government with Respect to Claims) and Title 18, U.S.C. Section 287 (False, Fictitious or Fraudulent Claims) not only use computers to access websites used for illegal activity and to communicate with co-conspirators online, but that they also store on computer hard drives and other electronic storage media documents and records relating to their illegal activity. Online criminals store these documents and records, which can include logs of online "chats" with co-conspirators; email correspondence; contact information of co-conspirators, including telephone numbers, email addresses, identifier for instant messaging and social media accounts; stolen financial and personal identification data, including bank account numbers, credit card numbers, and names, addresses, telephone

14934280.1

numbers, and Social Security numbers of other individuals; and records of illegal transactions using stolen financial and personal identification data, to, among other things, (1) keep track of co-conspirator's contact information; (2) keep a record of illegal transactions for future reference; (3) keep an accounting of illegal proceeds for purposes of, among other things, splitting those proceeds with co-conspirators; and (4) store stolen data for future exploitation.

ii. Individuals who engage in the foregoing criminal activity, in the event that they change computers, will often "back up" or transfer files from their old computers' hard drives to that of their new computers, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

iii. Computer, smart phone, and other digital device files, or remnants of such files, can be recovered months or even years after they have been downloaded onto an electronic storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to an electronic storage medium can be stored for years at little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  When a person "deletes" a file on a digital device such as a home computer or a smart phone, the data contained in the file does not actually disappear; rather, that data remains on the electronic storage medium until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the electronic storage medium that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten.  In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded

22

into a temporary Internet directory or "cache." The browser typically maintains digital data that is neatly divided from the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data on the electronic storage media not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a computer were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use. Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

iv.  Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence or business. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be

14934280.1

evidence of who used or controlled the computer or storage medium at a relevant time.

v.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

vi.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, electronic storage media and digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on electronic storage media or digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

vii.  Further, in finding evidence of how electronic storage media or a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device.  For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

viii.  I know that when an individual uses a digital device to prepare tax returns the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The digital device is

also likely to be a storage medium for evidence of the crime.  From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

42.    *Methods To Be Used To Search Digital Devices.*  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

i.   Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time.  There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals, specialized equipment, and software programs necessary to conduct a thorough search.  Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

ii.  Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity

25

of digital data and to recover "hidden," erased, compressed, encrypted, or
password-protected data.  Recovery of "residue" of electronic files from
electronic storage media also requires specialized tools and often
substantial time.  As a result, a controlled environment, such as a law
enforcement laboratory or similar facility, is essential to conducting a
complete and accurate analysis of data stored on digital devices.

iii.   The volume of data stored on many digital devices will typically be so
large that it will be extremely impractical to search for data during the
physical search of the premises.  Smart phones capable of storing 64
gigabytes, flash drives capable of storing 128 gigabytes, and desktop
computers capable of storing 500 or more gigabytes are now
commonplace.  Consequently, just one device might contain enormous
amounts of data.

iv.   Further, as discussed above, evidence of how a digital device has been
used, the purposes for which it has been used, and who has used it, may be
reflected in the absence of particular data on a digital device.  For
example, to rebut a claim that the owner of a digital device was not
responsible for a particular use because the device was being controlled
remotely by malicious software, it may be necessary to show that
malicious software that allows someone else to control the digital device
remotely is not present on the digital device.  Evidence of the absence of
particular data or software on a digital device is not divided from the
digital device itself.  Analysis of the digital device as a whole to
demonstrate the absence of particular data or software requires specialized
tools and a controlled laboratory environment, and can require substantial
time.

26

v.  Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.  Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms.  Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches.  Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format.  Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

vi.  Analyzing the contents of mobile devices can be very labor intensive and also requires special technical skills, equipment, and software.  The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device.  Additionally, most smart phones and other mobile devices require passwords for access.  For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode.  Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer.  Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many.  For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

vii.  Based on all of the foregoing, I respectfully submit that searching any electronic storage media or digital device for the information, records, or evidence subject to seizure pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete.  Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the media or devices.  In light of these

28

difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

viii.  In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

a.  Upon securing the target location, law enforcement personnel will, consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, seize any electronic storage media or digital devices, as defined above, deemed capable of containing the information, records, or evidence described in Attachment B and transport these items to an appropriate law enforcement laboratory or similar facility for review.  For all the reasons described above, it would not be feasible to conduct a complete, safe, and appropriate search of any such electronic storage media or digital devices at the target location.  The electronic storage media and digital devices, and/or any digital images thereof created by law enforcement in aid of the examination and review, will be examined and reviewed by law enforcement personnel in order to extract and seize the information, records, or evidence described in Attachment B.

b.  The analysis of the contents of any seized electronic storage media or digital devices may entail any or all of various forensic techniques as circumstances warrant.  Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer

29

believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

c.   In searching the seized electronic storage media or digital devices, the forensic examiners may examine as much of the contents of the electronic storage media or digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B.  In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B. Any search techniques or protocols used in searching the contents of the seized electronic storage media or digital devices will be specifically chosen to identify only the specific items to be seized under this warrant.

d.   SPEEDY TAX SERVICES is a functioning company that may conduct legitimate business.  The seizure of it's computers may limit its ability to conduct its business.  As with any search warrant, I expect that this warrant will be executed reasonably.  Reasonable execution will likely involve conducting an investigation on the scene of what

electronic storage media and digital devices must be seized or copied, and what electronic storage media and digital devices need not be seized or copied.  Where appropriate, law enforcement personnel executing the warrant will copy data, rather than physically seize computers, to reduce the extent of disruption.  If employees of SPEEDY TAX SERVICES so request, the agents will, to the extent practicable, attempt to provide the employees with copies of data that may be necessary or important to the continuing function of the its business.  If, after inspecting seized computers, it is determined that some or all of this equipment is no longer necessary to retrieve and preserve evidence, the government will return it.

## **CONCLUSIONS OF AFFIANT**

43.     Based on the foregoing facts and my training and experience, I believe there is probable cause to believe that the manager of STS is involved in a conspiracy to defraud the government, the preparation of false tax returns, as well as aggravated identity theft.  I believe there is probable cause to believe that the fruits, instrumentalities, and evidence of violations of Title 26 USC Section 7206(2) (Aiding or Assisting in the Filing of False or Fraudulent Returns), Title 18 USC Section 286 (Conspiracy to Defraud the Government with Respect to Claims), Title 18 USC Section 287 (False, Fictitious or Fraudulent Claims), and Title 18 USC Section 1028A (Aggravated Identity Theft) will be found at the aforementioned location, further described in Attachment A.


Respectfully submitted,

_____

Crystal Womble

Special Agent

Internal Revenue Service - Criminal Investigation

Subscribed and sworn to before me

on this_____ day of January, 2017

_____

UNITED STATES MAGISTRATE JUDGE

14934280.1

## ATTACHMENT A

**Location to be Searched:**

SPEEDY TAX SERVICES is located at 1002 H Street, NE, Washington, DC 20002 which is on the corner of H Street NE and 10th Street NE. This address is also the business address of The C.A.T. Walk Boutique.  The location of each business is clearly indicated by individual signs. SPEEDY TAX SERVICES is located on the right side of building, in approximately one-half of the building.



33

14934280.1

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

Based on the facts as recited in the attached affidavit, your affiant has probable cause to believe the following records, documents, and materials are located at the target location, and that these items may contain fruits, evidence, and instrumentalities of the crimes described in the affidavit. The terms "records", "documents", and "materials" include all of the subsequent items of evidence in whatever form and by whatever means such records, documents or materials, their, drafts, or their modifications may have been created and stored, including any handmade form (such as writing or drawing with any implement on any surface, directly or indirectly); any mechanical form (such as tape recordings, cassettes, compact diskettes, hard disks, CD-ROMs, optical discs, printer buffers, smart cards, memory calculators, as well as printouts or readouts from any magnetic storage device).

## A.  DOCUMENTARY RECORDS

1. Originals and/or copies of State and Federal Income Tax Returns for the tax years 2011, 2012, 2013, 2014, and 2015 together with all forms, schedules, and attachments including: any federal, state, or local jurisdiction tax form for the years in question; any correspondence to or from federal, state, or local taxing authorities and correspondence that appears to be to or from tax return preparation clients;

2. Worksheets and/or supporting documentation used in the preparation of tax returns, records identifying the taxpayers for whom these tax returns have been prepared, invoices, receipts or other records relating to tax consulting or tax preparation fees charged during tax years 2011, 2012, 2013, 2014 and 2015;

3. Client files, questionnaires, waivers, address and/or telephone books or listings, rolodex indices, forms of identification, specifically Social Security cards, identification cards

and driver's licenses, rubber stamps, business cards, calendars or other items reflecting names, addresses, telephone numbers, pager numbers, and fax numbers of associates, clients, financial institutions, taxpayers or other individuals or businesses with whom a financial relationship exists during the tax years 2011, 2012, 2013, 2014 and 2015;

4.  Records for tax years 2011, 2012, 2013, 2014 and 2015 relating to income tax refunds, Refund Anticipation  Loan (RAL) applications, RAL Checks, check stubs, check receipts, check cashing data, check inquiries and invoices;

5.  Records for tax years 2011, 2012, 2013, 2014 and 2015 relating to the disposition of tax refund proceeds including bank records, i.e. statements, checks and/or deposit tickets;

6.  Records of business operations to include all related individuals and entities of SPEEDY TAX SERVICES during the time period January 1, 2011 through the present, such as receipt books, journals, ledgers, billing records and invoices, deposit slips, cancelled checks, bank statements, payroll records, cash receipts and cash expense journals, worksheets, schedules client appointment books, cashier checks, money orders, financial statements, investment accounts, accounting records, records of purchases and revenues received, and payroll records that are related to the business, business tax returns, any and all business records establishing ownership and control of SPEEDY TAX SERVICES;

7.  Records of occupancy, residency, rental, and/or ownership of the premises to be searched, including utility and telephone bills, rental, purchase, or lease agreements during the time period January 1, 2011 through the present;

8.  Any locked or closed containers capable of containing any of the above listed evidence;

9.  All records and financial documents relating to SPEEDY TAX SERVICES, A.T., or A.F. during the time period January 1, 2011 through the present;

14934280.1

10. Instruction manuals, documents, booklets and pamphlets regarding tax law and tax preparation.

## B.  COMPUTER HARDWARE & SOFTWARE

Electronic devices which are capable of storing, analyzing, creating, displaying, converting or transmitting electronic or magnetic computer impulses or data that is contained in this warrant. These devices include:

1. Computers, computer components, computer peripherals, modems, monitors, printers, plotters, copiers, fax machines, optical scanners, external hard drives, and other computer related electronic devices,

2. Instructions or programs stored in the form of electronic or magnetic media which are capable of being interpreted by a computer or related components. The items to be seized include operating systems, application software, utility programs, and other programs of software used to communicate with computer hardware or peripherals,

3. Information and/or data stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer or with the aid of computer related equipment.   This media includes floppy disks, diskettes, fixed hard disks, removable hard disk cartridges, flash "thumb" drives and similar devices, tapes, video cassettes, and any other media which is capable of storing magnetic coding,

4. Digital cameras and digital camera storage cards,

5. Cellular telephones, PDAs, and other smart phones and their storage cards,

14934280.1

6.   Passwords, encryption keys, and other access devices that may be necessary to access the above devices or media, and

7.   Written or printed material which provides instructions or examples concerning the operation of any of the above devices, media, or software.

38